IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARNELL COOPER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13-cv-08632 |
| ) | |
| SALEH OBAISI, JONATHAN KELLY, ) | Hon. Edmond E. Chang |
| ARTHUR FUNK and WEXFORD HEALTH ) | |
| SOURCES, INC., ) | Jury Trial Demanded |
| ) | |
| Defendants. ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff DARNELL COOPER ("Plaintiff" or "Cooper"), by his appointed counsel, Robert J. Trizna of Robbins, Salomon & Patt, Ltd., for his second amended complaint against Defendants SALEH OBAISI ("Obaisi"), JONATHAN KELLY ("Kelly"), ARTHUR FUNK ("Funk") and WEXFORD HEALTH SOURCES, INC. ("Wexford"), states as follows:

### Jurisdiction and Venue

1. This is a civil action arising under the Civil Rights Act, 42 U.S.C. §1983;

2. The jurisdiction of this court is conferred by 42 U.S.C. §1983, 28 U.S.C. 12133, U.S.C. §794(a)(2) and 28 U.S.C. §1343(a)(3) and (4).

3. Cooper has exhausted all administrative remedies available to him prior to his bringing this lawsuit within the meaning of the Prison Litigation Reform Act, 42 U.S.C §1997, by pursuing the IDOC grievance process with respect to the claims set forth below.

4. Venue is proper in the Northern District of Illinois under 28 U.S.C. §1391(b) because all of the events giving rise to Cooper's claims occurred in this district.

## The Parties

5.  Plaintiff Cooper is a citizen of the United States, State of Illinois, and at all times material hereto has been an inmate, No. N-71947, at the Stateville Correctional Center ("Stateville") within the Northern District of Illinois.

6.  Defendant Obaisi at all times material hereto has been a licensed physician employed by Wexford and contracted by the Illinois Department of Corrections ("IDOC") to serve as the Medical Director of Stateville. Obaisi has seen, examined and treated Cooper for various illnesses and medical conditions, and is sued in both his individual and official capacity.

7.  Defendant Kelly at all times material hereto has been a licensed physician employed by Wexford and contracted by IDOC to serve as a physician/psychiatrist. Kelly regularly has seen, examined and treated Cooper for various illnesses and medical conditions, and is sued in both his individual and official capacity.

8.  Defendant Funk at all times material hereto has been a licensed physician employed by Wexford as its Regional Medical Director. On information and belief, Funk has supervisory authority over Obaisi, Kelly and Wexford's provision of health care services at Stateville. He is sued in his individual and official capacity.

9.  Defendant Wexford at all times material hereto has been engaged in the business of providing health care professionals and services to correctional facilities administered by IDOC, including Stateville. Wexford is responsible for ensuring that adequate medical care and treatment is provided to inmates such as Cooper in reasonable and timely fashion. Among the obligations undertaken by Wexford was to refer inmates to off-site medical specialists for certain diagnostic tests and therapeutic treatments, including surgery, for serious medical needs and conditions which were beyond the capacity of the staff and equipment at Stateville.

## COUNT I – Inadequate Medical Treatment

10. Cooper repeats and realleges Paragraphs 1 through 9 as and for this Paragraph 10.

11. Beginning around March 2012, Cooper began to suffer from a number of health issues, including persistent fatigue, stomach bloating, blood in his stool, chest pains and rapid heartbeat. By that point in time he also inexplicably had lost approximately 80 pounds during the previous 18 months.

12. Cooper began complaining about these symptoms to Kelly and other Wexford medical personnel.

13. On March 12, 2012, laboratory tests were done for Cooper. One of the test results showed that Cooper's level of thyroid-stimulating hormone ("TSH") was well below the acceptable 0.35 to 5.0 range and a clear indication – when viewed in light of Cooper's other symptoms – of hyperthyroidism.

14. Because the hormones produced by the thyroid gland influence every cell in the human body, hyperthyroidism is an extremely serious condition. Those hormones affect heart rate and the rate at which the body burns fats and carbohydrates, while also helping control body temperature and regulate the production of protein.

15. Among the recognized treatments for hyperthyroidism is a collection of anti-thyroid medications that prevent the thyroid gland from producing excess amounts of thyroid hormones. The two most utilized anti-thyroid medications are methimazole (the generic name for "Tapazole") and propylthiouracil, both of which can produce serious and even fatal liver damage as a side effect if not administered and monitored properly.

16. It is common medical knowledge that thyroid conditions and the medications used to treat them can be adversely affected by diet, especially diets that include significant amounts of soy or are deficient in non-soy protein.

17. Nothing was done to address Cooper's symptoms or to discover what underlying health problems were manifested through those symptoms, even though Kelly's diagnostic and treatment notes from his examination of Cooper on April 11, 2012 expressly indicate he was aware of Cooper's abnormal TSH test results from March 12, 2012.

18. On September 18, 2012, Cooper experienced severe chest pains and rapid heartbeat. He was seen by Obaisi, who noted Cooper's extremely low TSH levels and concluded that he was suffering from hyperthyroidism. Notwithstanding Obaisi's observations, no medication was prescribed for that condition until Obaisi prescribed Tapazole on October 26, 2012.

19. By November 2012, Cooper's health had deteriorated to the point that Obaisi issued an "urgent care" health care pass for him. Obaisi did not change Cooper's medication, however, nor did he accede to Cooper's request for a soy-free diet because soy is known to affect the thyroid.

20. On December 15, 2012, after Cooper finally had seen his medical records, he filed a grievance complaining that Kelly knew about Cooper's hyperthyroidism since April 2012 but did not inform Cooper or make any effort to treat that condition.

21. As a result of Kelly's inactions, Cooper was denied treatment for his hyperthyroidism for 152 days (from 4-11-12 to 9-18-12) even though the March 12, 2012 medical test results, on their face, clearly identified Cooper's TSH level as outside the normal range.

22. On September 18, 2012, Obaisi made notes concerning Cooper's low TSH level, and lab test was ordered after Cooper again complained of serious abdominal pain and blood in his stool.

23. Eight days later, on September 26, lab test results revealed that Cooper's TSH level was still below the accepted range.

24. On October 5, 2012, Obaisi diagnosed Cooper with "autoimmune thyroid disease." No treatment, however, was provided to Cooper and his severe pain continued.

25. On October 28, 2012, Obaisi prescribed the anti-thyroid medication Methimazole (generic for Tapozole 10mg tab) and a high protein/high calorie diet for Cooper.

26. Cooper did not get such a diet, and his pain and suffering continued without even any pain medication he requested to alleviate it.

27. On November 18, 2012, Cooper filed a grievance detailing his health problems, his lack of a high protein/high calorie, no/low soy diet. In a November 23 response to that grievance, counselor Harris stated that Cooper would get a "special diet tray when an order is received from the HCU [*i.e.*, the Health Care Unit] to do so."

28. Obaisi issued a "Therapeutic Diet Order" dated December 17, 2012, directing a "High Protein, High Calorie" diet, adding a comment about a "soy bean free diet" for a duration of one year. Despite Obaisi's and the HCU's firsthand knowledge of Cooper's serious and unsuccessfully-treated medical condition, no special diet tray was provided to him.

29. Cooper continued to suffer excruciating pain without any pain medication, and also developed severe rashes from the anti-thyroid medication, for which Obaisi prescribed Hydrocortisone cream and Benadryl. Obaisi also switched Cooper's thyroid medication from Tapozole to propylthiouracil.

30. Despite the foregoing treatment, Cooper's lab tests for January 23, 2013, showed that his TSH level had declined again; and it dropped even further by March 2, 2013.

31. From April 3 through July 71, 2013, Cooper continued to suffer from the previous hyperthyroidism symptoms and new symptoms such as extreme joint pain, chills, and vomiting after meals.

32. On July 1, 2013, Cooper was scheduled to see Obaisi when his health care pass was cancelled by Obaisi.

33. Cooper saw Obaisi on July 31, 2013, but no pain medication was prescribed and Cooper continued to suffer from the symptoms of his improperly-treated hyperthyroidism.

34. Nevertheless, on August 9, 2013, Cooper complained to Funk detailing the mistreatment of his hyperthyroidism and his denial of the prescribed diet. Funk had the authority to address the mistreatment of his condition and the denial of the prescribed diet. Funk took no action on Cooper's complaints for almost three months, and then sent Cooper a letter dated November 5, 2013, in which he stated that the care Cooper was receiving was "clinically appropriate." A copy of that letter is attached hereto as Exhibit A.

35. On October 3, 2013, Cooper had yet another appointment with Obaisi at which Obaisi acknowledge that Cooper's TSH level had never exceeded the below-normal range despite two (2) different kinds of hyperthyroidism medications that he had been taking for approximately one year. Obaisi instructed Cooper to increase the hyperthyroidism medication doses by 200 mg daily and, subsequently, to 400 mg daily.

36. After two years of being an experimental guinea pig for Obaisi and Kelly, all of which was known to Funk, none of the hyperthyroid medication succeeded in raising Cooper's TSH level into the acceptable range. Moreover, the Defendants continued, by their acts and omissions, to ensure that Cooper did not receive the special diet needed to improve his condition and reduce the severity of his symptoms.

37. On or about March 11, 2014, Cooper was taken off all hyperthyroid medication. As of that day and continuing to the present, Cooper has not had such medication and yet continues to suffer from all of the symptoms of hyperthyroidism about which he previously complained.

38. Cooper's hyperthyroidism is a serious condition that presents severe ongoing pain and suffering, and that carries with it the potential for seriously adverse long-term health consequences for Cooper.

39. Defendants Obaisi, Kelly, Funk and Wexford have known of Cooper's hyperthyroidism for well over two and one-half years, yet they have been deliberately indifferent to it by failing to take reasonable measures to deal with it, such as referring Cooper for thyroid specialist treatment after two and one-half years of their treatment has failed to adequately address or remedy the condition, in direct contravention of accepted and customary medical practices and of the inmate medical policies and procedures at Stateville.

40. As a direct and proximate result of that deliberate indifference to Cooper's health and well-being by Obaisi, Kelly, Funk and Wexford, Cooper has been deprived of his right to be free from cruel and unusual punishment as secured to him under the Eighth and Fourteenth Amendments to the United States Constitution, and has resulted in serious and continuing physical harm, pain and suffering that is likely to have substantial long-term adverse effects on his health and well-being.

WHEREFORE, Cooper respectfully prays that this Court:

a. award him temporary, preliminary and permanent injunctive relief to halt Defendants' damaging conduct toward him;

  b. award him temporary, preliminary and permanent injunctive relief compelling Defendants to immediately and on an ongoing basis provide proper medical treatment for him either inside or outside Stateville;

  c. grant him judgment for actual, consequential, compensatory and punitive damages against Defendants, and each of them, as this Court deems appropriate;

  d. award him his costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

  e. award such other and additional relief as this Court deems appropriate.

         DARNELL COOPER

         By:   /s/ Robert J. Trizna
            One of his attorneys

Robert J. Trizna (ARDC No. 3123760)
ROBBINS SALOMON & PATT, LTD.
180 North LaSalle Street, Suite 3300
Chicago, Illinois 60601
(312) 782-9000 -Telephone
312) 782-6690 – Facsimile

101633402



## Wexford Health
SOURCES INCORPORATED

*November 5, 2013*

Mr. Darnell Cooper #N71947
Stateville Correctional Center
P.O. Box 112
Joliet, IL 60434

Subject: <u>Your Letter Dated 8/9//2013</u>

Dear Mr. Cooper:

We are in receipt of your recent letter dated August 9, 2013.

We requested review of your care with the facility Site and Regional Medical Directors and consider the care currently being provided, as well as the care previously provided, to be clinically appropriate.

If you have concerns regarding your medical care, please follow the established sick call process and grievance procedure at the facility to get these concerns addressed.

Please be assured that the medical staff at Stateville C.C. is comprised of qualified and dedicated professionals who are there to assist your medical needs.

Very truly yours,

Wexford Health Sources, Inc.
Risk Management Department



EXHIBIT A

425 HOLIDAY DRIVE | FOSTER PLAZA TWO | PITTSBURGH, PA 15220 | P: 412-937-8590 | F: 412-937-8599 | WWW.WEXFORDHEALTH.COM